AO 91 (Rev. 11/11)  Criminal Complaint

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

# UNITED STATES DISTRICT COURT
for the
Southern District of Texas

United States Courts
Southern District of Texas
FILED
*November 28, 2025*
Nathan Ochsner, Clerk of Court

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Benlin YUAN | ) | Case No. |
| | ) | 4:25-mj-712 |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of    November 1, 2023, to present,    in the county of    Fort Bend    in the

Southern    District of    Texas    , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. §§ 4819 (a)(1), (a)(1)(A), (a)(2)(D), and (b); and | Conspiracy to Violate the Export Control Reform Act and the Export Administration Regulations |
| 15 C.F.R. §§ 736.2(b)(1), 742.6, and 764.2 and part 774, Supp. No. 1 | |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

*Tyler Fox*

_____
*Complainant's signature*

Tyler S. Fox, Special Agent, U.S. Dept. of Commerce
*Printed name and title*

Attested to by the complainant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    November 28, 2025

_____
*Judge's signature*

City and state:    Houston, Texas

Hon. Richard W. Bennett, U.S. Magistrate Judge
*Printed name and title*

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

### "ATTACHMENT A"

### INTRODUCTION

I, Tyler Fox, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief.

I am a Special Agent with the United States Department of Commerce, Bureau of Industry and Security ("BIS"). I have been so employed since July 2024, and I am currently assigned to the Office of Export Enforcement's Forward Assigned Post – San Antonio, Texas. Prior to my employment with BIS, from 2020 until July 2024, I was a Special Agent with the U.S. Drug Enforcement Administration, St. Louis Division, where I participated in criminal investigations of drug trafficking and money laundering. As a BIS Special Agent, I am charged with investigating the unlawful export of goods and commodities controlled for export by the Department of Commerce, including firearms and technology, for reasons of national security and/or foreign policy. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am authorized by law to conduct investigations into alleged violations of federal law. Since joining BIS and the Office of Export Enforcement, I have investigated, among other things, violations of the Export Control Reform Act, 50 U.S.C. §§ 4801-4852 and the smuggling of goods from the United States, in violation of 18 U.S.C. § 554.

This affidavit is made in support of a criminal complaint against Benlin Yuan for Conspiracy to Violate the Export Control Reform Act and the Export Administration Regulations in violation of 50 U.S.C. §§ 4819 (a)(1), (a)(2)(A), (a)(2)(D), and (b); and 15 C.F.R. §§ 736.2(b)(1), 742.6, and 764.2 and part 774, Supp. No. 1.

I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. The facts in this affidavit come from my personal

1

observations, my training and experience, and information obtained from other agents, witnesses, and agencies, including the Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"). This affidavit is intended to show merely that there is sufficient probable cause for the requested Criminal Complaint. It does not set forth all my knowledge, or the knowledge of others, about this matter.

## LEGAL BACKGROUND

### 1. Export Control Reform Act (ECRA) and Export Administration Regulations (EAR)

1.     The Export Control Reform Act of 2018 ("ECRA") provides, among its stated policy objectives, that "[t]he national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items . . . be controlled." 50 U.S.C. § 4811(2). To that end, ECRA grants the President the authority to control, among other activities, "the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons." *Id*. at § 4812(b). ECRA further grants to the Secretary of Commerce the authority to establish the applicable regulatory framework. *Id*. at § 4813(a).

2.     Pursuant to ECRA, the Department of Commerce reviews and controls the export of certain items, including commodities, software, and technologies, from the United States to foreign countries through the Export Administration Regulations ("EAR"), 15 C.F.R. parts 730-774. In particular, the EAR restrict the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR impose licensing and other requirements for items subject to the EAR to be exported lawfully from the United States or re-exported lawfully from one foreign destination to another.

2

3.     The most sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"), published at 15 C.F.R. part 774, Supp. No. 1.  Items on the CCL are categorized by an Export Control Classification Number ("ECCN") based on their technical characteristics.  Each ECCN has export control requirements depending on the destination, end user, and end use.

4.     The EAR establish the responsibility of the Department of Commerce, Bureau of Industry and Security ("BIS") to approve or deny export license applications with the input of other federal agencies.  If a license is required for a transaction subject to the EAR and the transaction does not qualify for a specific license exception, a U.S. person must submit a license application to BIS and receive a license prior to engaging in the transaction.  The license may be subject to certain terms and conditions defined by BIS or other federal agencies.

5.     Pursuant to 50 U.S.C. § 4819(a)(1), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this subchapter or of any regulation, order, license, or other authorization issued under this subchapter, including any of the unlawful acts described in paragraph (2)."  Such unlawful acts include, among others, that: "[n]o person may engage in any conduct prohibited by or contrary to, or refrain from engaging in any conduct required by [ECRA and the EAR], or any order, license or authorization issued thereunder," including the unlicensed export or reexport of an item subject to the EAR and on the CCL.  *See* 50 U.S.C. § 4819(a)(2)(A), 15 C.F.R. § 736.2(b)(1).

**2. Advanced Computing/Supercomputing Interim Final Rule (AC/S IFR)**

6.     Beginning on October 7, 2022, BIS began amending the EAR to implement new controls on advanced computing integrated circuits ("ICs"), computer commodities that contain ICs, and certain semiconductor manufacturing items, including certain Nvidia-manufactured Graphic Processing Units ("GPUs"), through an interim final rule (effective on October 7, 2022).

3

*See* 15 C.F.R. § 744.23; 87 Fed. Reg. 62186 (Oct. 7, 2022). The purpose of the rule is "to protect U.S. national security and foreign policy interests by restricting the [People's Republic of China's] access to advanced computing for its military modernization, including nuclear weapons development, facilitation of advanced intelligence collection and analysis, and for surveillance." BIS further imposed additional export controls on certain advanced computing semiconductor chips (chips, advanced computing chips, integrated circuits, or ICs), transactions for supercomputer end-uses, and transactions involving certain entities on the Entity List. These restrictions applied to high-performance ICs that are useful in data center processing and artificial intelligence, with a total processing performance of 4800 or more, or a total processing performance of 1600 or more and a performance density of 5.92 or more. These controls and restrictions applied to the People's Republic of China ("PRC"), including Hong Kong and Macau.

7.     On October 25, 2023, BIS released an interim final rule (effective on November 17, 2023) that expanded the export controls related to advanced computing and semiconductors, including with respect to additional Nvidia-manufactured GPUs, which had been developed specifically for the PRC following the October 7, 2022 restrictions. According to the interim final rule, "[t]hese revisions protect U.S. national security interests by further restricting China's ability to obtain critical technologies to modernize its military capabilities in ways that threaten the national security interests of the United States and its allies." 88 Fed. Reg. 73458 (Oct. 25, 2023).

**3. Export Controls on Relevant GPUs, Baseboards, and Servers**

8.     There are several Nvidia products described below that the defendant and his co-conspirators conspired to unlawfully export and smuggle outside the United States, all of which were subject to export controls and required a license from BIS for export to the PRC, including Hong Kong, at all times relevant to this Affidavit.

4

9.      The following items are classified under ECCN 4A090.a: Nvidia H100 GPUs; Nvidia H200 GPUs; Nvidia H200 GPU baseboards; Nvidia HGX A100 8-GPUs; and Nvidia HGX A100 640 GB GPU baseboards.  Items classified under ECCN 4A090.a are controlled for regional stability (RS) and anti-terrorism (AT) reasons and require a license for export to the PRC, including Hong Kong.  See 15 C.F.R. 742.6(a)(6)(iii)(A).

10.      The following item is classified under ECCN 3A090.a: Nvidia A100 GPU 80GB SXM4.  Items classified under ECCN 3A090.a are controlled for regional stability (RS) and anti-terrorism (AT) reasons and require a license for export to the PRC, including Hong Kong. See 15 C.F.R. 742.6(a)(6)(iii)(A).

11.      The following items are classified under ECCN 5A002.z: SuperMicro SuperServers 420GP-TNAR/420GP-TNAR+ and SuperMicro A+ servers configured with A100 baseboards.  Items classified under ECCN 5A002.z are controlled for regional stability (RS) and anti-terrorism (AT) reasons and require a license for export to the PRC, including Hong Kong. See 15 C.F.R. 742.6(a)(6)(iii)(A).

**4. Smuggling**

12.      Pursuant to Title 18, United States Code, Section 554, it is unlawful to fraudulently or knowingly export or send from the United States, or attempt to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States.

**5. Unlawful Export Information Activities**

13.      Pursuant to U.S. law and regulations, exporters or their authorized agents, such as shippers or freight forwarders, are required to file certain forms and declarations concerning the

5

export of goods and technology from the United States. Typically, those documents are filed electronically through the Automated Export System ("AES"), which is administered by the U.S. Department of Homeland Security, Customs and Border Protection ("CBP").

14.    The Electronic Export Information ("EEI") (formerly known as the Shipper's Export Declaration ("SED")) is the required documentation submitted to the U.S. Government through the AES in connection with an export shipment from the United States. Exporters or their authorized agents are required to file an accurate and truthful EEI for every export of goods from the United States with a value of $2,500 or more. EEI also is required, regardless of the value of the goods, if the goods require an export license. 15 C.F.R. §§ 758.1 and 30.2.

15.    Title 13, United States Code, Section 305, makes it a federal crime to knowingly fail to file or to knowingly submit false or misleading export information through the SED, EEI, or the AES, or to otherwise use the SED or the AES to further any illegal activity.

**DEFENDANT AND RELEVANT PARTIES**

16.    The defendant, Benlin Yuan, is the President of an information technology company in Virginia ("IT Company") that provides data center services, IT support and cloud consulting services in North America. IT Company is a subsidiary of a Beijing, China-based information technology Company ("PRC IT Company") that provides services for computing equipment.

17.    Co-conspirator-1 is an employee of a Shenzhen, China-based technology company that is a supplier of AI equipment and provides services related to import and export declarations ("Shenzhen Technology Company"). Co-conspirator-1 is also connected to a Hong Kong-based shipping and logistics company ("Hong Kong Logistics Company") that is affiliated with Shenzhen Technology Company. For example, certain public financial records describe Hong Kong Logistics Company as part of the corporate network of Shenzhen Technology Company.

6

Certain other co-conspirators described below are connected to Shenzhen Technology Company and/or Hong Kong Logistics Company.

18.     Co-conspirator-2 and Co-conspirator-3 are high-level employees of PRC IT Company.  Co-conspirator-2 also appears to be a director of IT Company.  Cooperating Witness-1 ("CW-1") is an employee of IT Company.[1]

19.     Co-conspirator-4 and Co-conspirator-5 appear to be based in the PRC and affiliated with Hong Kong Logistics Company and/or Shenzhen Technology Company.

## SUMMARY OF PROBABLE CAUSE

20.      BIS, HSI, and the Federal Bureau of Investigation ("FBI") are investigating a sophisticated illicit procurement conspiracy and smuggling network that is orchestrating the purchase and unlicensed export of controlled Nvidia A100, H100, and H200 Tensor Core GPUs and HGX baseboards, which are used for artificial intelligence ("AI") applications and high-performance computing ("HPC"), to the PRC, including Hong Kong, and other destinations, in violation of U.S. export laws.  Specifically, a GPU is an electronic circuit that can perform calculations at high speed, key to processing the vast amounts of data used to train AI applications. A tensor core is a specialized processing unit within a GPU that is designed to accelerate matrix operations, which are used in AI, deep learning, and HPC tasks.  A GPU baseboard is a server platform that integrates multiple high-performance GPUs.  A GPU server is a kind of server that has additional GPUs in addition to standard Central Processing Units (CPUs) – a CPU is the primary component of a computer that is key to running a computer's operating system and

---

[1] CW-1 was approached by law enforcement and agreed to provide information. CW-1 is lawfully present in the United States and is seeking permanent residency status. CW-1 has no criminal history and is not providing information to law enforcement for any monetary gain or judicial consideration.

applications.  These technologies are dual-use, i.e. they are used for both civilian and military applications.

21.　　From at least in or about November 2023, Hong Kong Logistics Company and its co-conspirators have engaged in a conspiracy to unlawfully export Nvidia technologies from the United States to the PRC.  From at least on or about May 21, 2025, defendant Benlin Yuan joined the conspiracy.  Yuan, along with known and unknown co-conspirators, knowingly and willfully conspired to export from the United States to the PRC, including Hong Kong, controlled Nvidia GPUs and baseboards, without first obtaining the required licenses or authorizations from the United States Department of Commerce in violation of ECRA, 50 U.S.C. §§ 4819 (a)(1), (a)(1)(A), (a)(2)(D), and (b); and 15 C.F.R.  §§ 736.2(b)(1), 742.6, and 764.2 and part 774, Supp. No. 1.

22.　　As part of the overall scheme, employees of Hong Kong Logistics Company and Shenzhen Technology Company conspired with the defendant and others inside and outside the United States to violate U.S. export controls by obtaining export-controlled Nvidia GPUs through straw purchasers and intermediaries, including in the Southern District of Texas, and falsely indicating that the goods were for U.S. customers or customers in third countries such as Taiwan or Thailand, which would not require a license from BIS.  The GPUs were shipped to multiple U.S. warehouses, where individuals removed Nvidia labels and relabeled the GPUs with labels bearing the name "SANDKYAN" – believed to be a fake company – and then prepared the goods for export.  The shipping and export paperwork, submitted in AES, also misclassified the goods as "adapters," "adapter modules," or "contactor controllers."  The co-conspirators then shipped the goods or attempted to do so, directly or indirectly, to the PRC and Hong Kong in violation of export laws.

23.    As further described below, on or about May 10, 2025, agents investigating this scheme received information regarding pallets of Nvidia GPUs being stored in a U.S. logistics company's ("U.S. Logistics Company") leased New Jersey warehouse ("New Jersey Warehouse") that were destined for the PRC.  When agents visited the New Jersey Warehouse two days later, including an undercover agent ("UC-1"), they observed individuals relabeling the Nvidia GPUs with labels for the fake company (SANDKYAN).  As further detailed below, BIS subsequently detained the GPUs and moved them to another government-controlled facility.  The government-controlled warehouse received numerous calls about the missing GPUs from unknown individuals.

24.    Because of the delayed shipment, the intended recipient of the goods believed the GPUs had been stolen by UC-1.  After UC-1 was put into contact with Co-conspirator-4, Co-conspirator-4 ultimately offered a $1 million payment to release the goods.  However, Co-conspirator-4 required that the GPUs be inspected prior to payment.  Yuan and co-conspirators from Hong Kong Logistics Company and PRC IT Company arranged for six "inspectors" approximately two weeks later.  At least four of the six inspectors were employees of IT Company.

25.    After BIS detained the GPUs from the New Jersey Warehouse and moved them to another location, BIS sent a detention notice to an individual who represented himself as a lawyer representing the owner of the GPUs and other equipment. Co-conspirators from Hong Kong Logistics Company, PRC IT Company and Yuan then developed detailed plans with false information to present to BIS as a compliance back-story to attempt to secure the release of the GPUs and other items that had been detained.  Additionally, for an entirely separate batch of Nvidia GPUs, IT Company's office and storage space was used to store and eventually ship those GPUs outside of the United States on behalf of the Hong Kong Logistics Company.

9

26.     The defendant Benlin Yuan directed multiple aspects of the GPU smuggling scheme.  First, Yuan helped organize IT Company's employees to inspect the mislabeled GPUs prior to the $1 million payment along with Co-conspirator-1, who was acting on behalf of Hong Kong Logistics Company, which was the ultimate customer for certain GPUs. Co-conspirator-1 directed Yuan to ensure that the inspectors did not say that the goods were destined for the PRC, and Yuan agreed.  Second, Yuan directed discussions regarding the story the company would use to respond to BIS to get the GPUs and other detained equipment released. Yuan engaged in several conversations about providing false information to U.S. authorities regarding the ultimate customer of the goods.  Third, Yuan participated in and directed actions involving IT Company's handling of the storage of another shipment of Nvidia GPUs and eventual export, on behalf of Hong Kong Logistics Company.  When Co-conspirator 5 from Shenzhen Technology Company directed CW-1 to remove Nvidia labels from the GPUs and replace them with fake labels, Yuan directed that CW-1 should not put on the fake labels as that could cause problems.[2]  According to CW-1, Yuan was concerned that the labels would be suspicious. Ultimately, CW-1 removed the Nvidia labels but did not affix fake labels.

27.     Neither Yuan, IT Company, PRC IT Company, Hong Kong Logistics Company, Shenzhen Technology Company, or their known co-conspirators had a license from BIS or a pending license application to export to China any of the export-controlled Nvidia GPUs, baseboards or other servers described in this Affidavit.

## STATEMENT OF PROBABLE CAUSE

1.  **Houston Company-1 Purchased Export-Controlled GPUs on Behalf of Hong Kong Logistics Company, Which Were Transported and Stored by Same U.S. Logistics**

---

[2] All communications described in this Complaint occurred in Mandarin, unless otherwise noted, and the communications referenced here are certified translations.

10

**Company as the GPUs Inspected by IT Company Employees on Behalf of Hong Kong Logistics Company**

28.     From October 2024 to May 2025, ("Houston Resident-1"), utilizing his company, Houston Company-1, knowingly purchased and smuggled export-controlled Nvidia H100 and H200 GPUs out of the United States.  Those GPUs were ultimately exported to the PRC and Hong Kong.

29.     Specifically, Houston Company-1 purchased at least $60 million worth of GPUs from a U.S. global technology company ("U.S. Global Technology Company").   Houston Company-1 received funds from various entities to facilitate the purchases, including companies based in the PRC.  Houston Company-1 received at least $1.5 million directly from Hong Kong Logistics Company and received other funds indirectly – for example, using front companies – from PRC companies.  Shipping records show that GPUs purchased from U.S. Global Technology Company by Houston Resident-1 were ultimately exported to the PRC, including by transshipping the GPUs through Singapore and Malaysia, without the required licenses from the Department of Commerce.

30.     On March 14, 2025, Houston Company-1 scheduled GPUs for pickup at U.S. Global Technology Company's distribution center.  The GPUs were then shipped to U.S. Logistics Company's warehouse in New York.[3]   Shipping records confirmed the GPUs arrived at that warehouse on March 15, 2025.  During an interview of U.S. Logistics Company's representative ("U.S. Logistics Company Representative") in May 2025, agents learned that the GPUs arrived at the warehouse at the request of a PRC-based logistics company ("PRC Logistics Company").

---

[3] U.S. Logistics Company then began leasing another warehouse in New Jersey because of a pricing dispute which is later described in the Affidavit.

11

31.    According to the U.S. Logistics Company Representative, the U.S. Logistics Company handled the receiving, warehousing, palletizing, and shipping of domestic freights for PRC Logistics Company.  The orders typically included only the number of pallets, weight, and dimensions of the goods to be shipped; the orders did not include a description of the contents, which would typically be included as part of paperwork in the normal course.

32.    According to the U.S. Logistics Company Representative, whenever a shipment arrived at U.S. Logistics Company's warehouse, the PRC Logistics Company would arrange for "engineers" to visit the warehouse for testing and inspection of the goods.  The U.S. Logistics Company Representative had, on at least one occasion, been present during the engineers' testing and inspection of a shipment and observed that the contents of the shipments were all marked "Nvidia."    Photographs taken by U.S. Logistics Company Representative during the testing/inspection, and provided to agents, show a box of opened Nvidia products, which agents believed to be export-controlled Nvidia GPU baseboards.  Additional photographs show the engineers working on at least four pallets of items, all of which appear to be Nvidia HGX baseboards.

33.    Once testing and inspection were completed, the engineers repackaged the products, and U.S. Logistics Company arranged for the packages to be re-palletized before they were shipped via truck to a New York shipping company's ("New York Shipping Company") leased warehouse space in New York ("New York Warehouse"), as requested by the PRC Logistics Company.  Every shipment that U.S. Logistics Company handled for the PRC Logistics Company was routed to go to the same New York Shipping Company's New York Warehouse.

34.    All known communication between the PRC Logistics Company and the engineers was in Mandarin and done via an encrypted messaging application.  Agents identified three of the

12

engineers based on photographs and identifiers provided by the PRC Logistics Company to U.S. Logistics Company.  One of the engineers was identified as having unlawfully entered the United States from Mexico, at a time and place not designated by immigration officials, near McAllen, Texas, in the Southern District of Texas ("Engineer-1").[4]

35.    During an interview of the U.S. Logistics Company Representative on May 10, 2025, agents learned that 14 pallets that were due to be sent to New York Shipping Company were being stored at the U.S. Logistics Company's New Jersey warehouse ("New Jersey Warehouse"). An additional 26 pallets were on the way to the New Jersey Warehouse.  Per communications from the PRC Logistics Company, the engineers planned to test and inspect all goods contained in the pallets before the U.S. Logistics Company shipped the pallets to the New York Warehouse. Specifically, two engineers were scheduled to inspect the pallets on May 12, 2025.

**2. BIS Detained Mislabeled GPUs and UC Operation Led to Negotiation of Inspection by IT Company Employees and $1 Million Payment to Release Goods**

    a.   <u>Agents Observed Mislabeled Nvidia GPUs with Fake Company Labels and Shipping Records Showing False Information</u>

36.    On May 12, 2025, UC-1 went to U.S. Logistics Company's New Jersey Warehouse for approximately one hour.  During that time, UC-1 observed two engineers, both appearing of Chinese origin, unboxing and inspecting open boxes of Nvidia GPU baseboards.  UC-1 spoke in Mandarin with Engineer-1.  During the conversation, UC-1 inquired about what Engineer-1 and his colleague were working on.  Engineer-1 stated they were working to change the labels of the products, and that they needed to cover all the original Nvidia product labels.  When UC-1 asked Engineer-1 why they needed to change the labels, Engineer-1 responded that it was for "export

---

[4] On May 29, 2025, Engineer-1 was arrested in New York for Improper Entry by Alien in the Southern District of Texas. Engineer-1 provided a post-*Miranda* statement to law enforcement. Additionally, on July 25, 2025, agents interviewed Engineer-1 with his attorney present.

13

purposes." When UC-1 asked further about the export issues, Engineer-1 replied that they probably should not discuss those problems.

37.    During his time in the New Jersey Warehouse, UC-1 observed both engineers removing Nvidia labels from the GPUs and replacing them with other labels with the name "SANDKYAN." The engineers carried pages of preprinted labels, including new barcodes and "SANDKYAN" product labels. The engineers placed these adhesive labels over existing Nvidia product codes.

38.    Open-source searches of "SANDKYAN" did not reveal any results indicating such a brand or company bearing that name exists; thus, there is reason to believe that "SANDKYAN" is a fabricated brand used to obfuscate the fact that the GPUs – which were subject to U.S. export controls – were in fact Nvidia GPUs.

39.    On May 13, 2025, UC-1 and another BIS agent returned to the New Jersey Warehouse. The agents observed the pallets the engineers had inspected during the previous day – all of which now contained "SANDKYAN" labels – and the newly delivered pallets. The anti-tampering tape on the boxes was taped over, and several new adhesive labels were placed on the outside, falsely describing the products as "Adapter Group." The new labels also listed the origin of the product as "Made in Taiwan," with new product numbers, carton ID, serial numbers, and QR codes. Agents also observed additional product labels with descriptions of "Adapter Group," fictitious model numbers, and stickers bearing the "SANDKYAN" brand name.

40.    Based on my training and experience, hiding the origin and type of the goods using false information is a common tactic to evade export controls by avoiding potential inspections when goods are shipped outside the United States.

41.    The newly delivered pallets also included servers that contained Nvidia HGX A100 GPU baseboards.  Except for one invoice and two bills of lading, there was otherwise no physical paperwork in the warehouse showing where the products came from.  The invoice, which was recovered from a single pallet, showed an Australian company as the purchaser of 100 Nvidia H200 GPUs from a U.S. supplier and Australia as the ultimate destination.  Both bills of lading, which were recovered from discarded packaging materials, showed a Massachusetts company that is a retailer of Nvidia GPUs in Southborough, Massachusetts ("Massachusetts Company-1") as seller, with shipment to the New Jersey Warehouse.

42.    To prevent the illegal export of these goods, agents detained and removed all the GPUs from the warehouse.  In total, the agents recovered more than $30 million worth of export-controlled GPUs and other items from the New Jersey Warehouse.

43.    In May 2025, agents also conducted a query for the New York Shipping Company in CBP's AES regarding past export records and activity.  Agents learned that the New York Shipping Company began filing EEI with commodity descriptions including "adapter group," "adapter module," and "adapter board," in March 2025.  These filings continued from March 12, 2025 through at least May 13, 2025.  The shipments were filed "no license required" with an ultimate destination of an air freight facility near the Toronto International Airport in Canada.  The ECCN field for all these export filings was left blank.  Based on my training and experience, I know that leaving the ECCN field blank is a tactic used to conceal the true nature of the shipment and is an indication that the products may be diverted to other countries contrary to U.S. law and export controls.

44.    On May 16, 2025, agents spoke with employees of the New York Shipping Company at its offices.  The employees informed agents that they recently had several exports to

15

Canada. The contents of the exports were described as "adapters," and the shipments were directed by an individual based in Hong Kong. A review of EEI filings for the Canada exports listed a company with a Colorado address ("Colorado Company-1") as the U.S. Principal Party of Interest ("USPPI") with an individual listed as the company agent. The point of contact for the company and the name on shipping documents, however, was Co-conspirator-1, an employee of Shenzhen Technology Company. When agents visited the address, they discovered it was a co-working space and no individuals at the space knew of Colorado Company-1. Agents did not identify a valid bank account or business activity for the Colorado Company.

45.    Agents also reviewed the bills of lading tied to exports handled by the New York Shipping Company during the five-day period between March 11 and March 16, 2025. Agents discovered a bill of lading for three pallets of "adapter groups" with the intermediate and ultimate consignee listed as Hong Kong Logistics Company. A review of the shipper's letter of instruction and invoices indicated that the shipment included 23 pieces of "Sandkyan Adapter Group," with an invoice in which Colorado Company-1 had sold the items to Hong Kong Logistics Company. Based on the items being falsely described in the same manner as Houston Company-1's purchases and exports of GPUs, agents believe this was a shipment of Nvidia Tensor Core GPUs that was unlawfully exported to Hong Kong.

        b.    <u>Detention of Goods and UC Operation Leads to Ransom Payment of $1 Million to Release GPUs</u>

46.    Following law enforcement's removal of the Nvidia GPU baseboards from the New Jersey Warehouse on May 13, 2025, the recipient of the goods in New York indicated that they believed UC-1 had stolen the goods. The government-controlled warehouse where the equipment was detained received numerous calls about the missing goods. UC-1 then received information regarding a legal demand letter sent by another company registered in Colorado ("Colorado

Company-2") to the owner of the New Jersey Warehouse stating that the goods belonged to the company.

47.    Thereafter, UC-1 received contact information from the U.S. Logistics Company Representative of a Mandarin-speaking individual, Co-conspirator-4, on May 20, 2025.  UC-1 and Co-conspirator-4 began communicating via an encrypted messaging application.  Co-conspirator-4 believed UC-1 had stolen the disguised Nvidia GPUs from the warehouse.  Co-conspirator-4 was unaware that UC-1 was an undercover agent, and that the GPUs were detained by law enforcement. UC-1 asked whether Co-conspirator-4 sent the demand letter.  Co-conspirator-4 confirmed that he asked "his lawyer" to send the letter and that he would ask the lawyer to stand down. Co-conspirator-4 then offered to make a payment for release of the goods and negotiated terms in which UC-1 would release the GPUs in exchange for a payment of $1 million to a bank account (set up by the U.S. government) in Houston, Texas.  On May 21, 2025, Co-conspirator-4 informed UC-1 that $1 million would be deposited into the Houston account from a U.S.-based company, and Co-conspirator-4 requested that UC-1 generate a fictitious invoice to send to the U.S.-based company justifying the payment.  However, Co-conspirator-4 required that the GPUs be inspected and inventoried before the payment was made.  UC-1 requested the names of those who would be inspecting the mislabeled GPUs.  On May 23, 2025, Co-conspirator-4 sent the names of six individuals to UC-1.  As described below, agents identified at least four of those individuals as employees of IT Company.

c.    Yuan Organized the Inspection of GPUs in Warehouse Prior to Ransom Payment to Release GPUs

48.    On May 21, 2025, Co-conspirator-3, who is a high-level employee of PRC IT Company and who reports to Co-conspirator-2 along with Yuan, invited Yuan to a messaging application group chat to discuss the retrieval of equipment held in the possession of UC-1.

17

Members of the group chat all believed UC-1 had taken possession of the Nvidia products and would not release them unless the $1 million payment was made and were unaware the equipment was detained by BIS Special Agents. That group chat included Yuan, employees of PRC IT Company (Co-conspirators -2 and -3), and representatives from Hong Kong Logistics Company and Shenzhen Technology Company (Co-conspirators -1, -4, and -5).[5]

49.    In the group chat, on May 21, 2025, Co-conspirator-1 described a formal plan to retrieve the equipment, including meeting with UC-1 at a pre-determined location; traveling with UC-1 to a warehouse to observe the equipment; sending trucks to the warehouse to transport the equipment; having engineers inspect the equipment on-site; and arranging a wire transfer after the inspection in exchange for UC-1 releasing the equipment.

50.    Approximately two hours after the plan was detailed, Co-conspirator-5, who was also in the group chat, suggested they meet through a video-conferencing application. Screenshots of Co-conspirator-5's social media profile in the messaging application show a photo of a large group holding a Shenzhen Technology Company banner bearing the caption "My brothers and I are particularly outstanding" in Mandarin, indicating Co-conspirator-5 was likely acting on behalf of Shenzhen Technology Company.

51.    A few minutes later, an unidentified user ("UU-1"), who appeared to be affiliated with Hong Kong Logistics Company, sent a link to a virtual meeting. Moments later, Co-conspirator-2 suggested that Yuan go ahead and speak with Co-conspirator-3 and others from Hong Kong Logistics Company. Co-conspirator-2 also added that [Hong Kong Logistics Company] is a "best friend" of [PRC IT Company], has helped them a lot, and "[we are] making

---

[5] Specifically, the group chat included an individual with a username with the same first name as Co-conspirator-1. According to CW-1, stated to agents this individual in the group chat was in fact Co-conspirator-1.

18

an all-out effort." Less than fifteen minutes later, Yuan responded that he was available, and based on messaging application records, it appears a virtual conference occurred.

52. Approximately nineteen minutes later, UU-1 sent to the group chat a link to a .docx file titled "U.S. Goods Inspection Merchandise Details." This document was identical to the paperwork the six inspectors had on May 27, 2025, described below, which contained an inventory of all the equipment expected to be in the New Jersey Warehouse. The document also contained several images of Nvidia HGX H200 baseboards, which were relabeled "SANDKYAN" and an inventory of items, including "91 H200 GPU baseboards, 43 A100 GPU modules, 14 cards, 2 whole servers, and 29 motherboards."

53. On May 21, 2025, after forwarding the inspection document, UU-1 addressed Yuan directly and informed him that the document contained details to verify the goods during inspection. One hour later, Co-conspirator-1 provided a location in New Jersey and informed Yuan it was the approximate location of UC-1's warehouse. Co-conspirator-1 further explained to Yuan that the inspectors must register in advance and requested that Yuan provide personnel information including the names and driver's license numbers for the inspectors who would examine the Nvidia products. The inspection was originally planned for Friday, May 23, 2025.

54. Approximately forty-five minutes later, Co-conspirator-1 said, "Manager Yuan, just finished negotiations with the other party." About thirty minutes later, another unidentified group chat member, UU-2, asked whether it would be "possible for [PRC IT Company] to cut a check? Or something along those lines could speed up the payment process." In response, Co-conspirator-2 said, "Manager Yuan, if you could look into it."

55.     About fifteen minutes later Yuan asked that if the money did not arrive by Friday, whether "all of us" would head home and then "come back on Tuesday to check the merchandise and pick everything up." Co-conspirator-1 responded that this was still under discussion.

56.     As to the question regarding a check, approximately ten minutes later, Yuan responded by inquiring how much. UU-2 stated it was $1 million USD. Yuan responded that the amount was large and difficult. In the evening of May 21, Co-conspirator-1 informed Yuan that the inspectors would need to meet and perform the inspection on Tuesday, May 27, 2025. Co-conspirator-1 informed Yuan that following the inspection, the inspectors would need to remain and watch the equipment until the items were picked up that afternoon. Yuan acknowledged the message and said, "sounds good." Co-conspirator-1 asked Yuan to arrange for the personnel and send Co-conspirator-1 the names and driver's license numbers or passport numbers. Co-conspirator-1 then asked Yuan to put the "engineers" into a group chat so they could communicate in a group about the inspection details.

57.     On May 22, 2025, Yuan asked Co-conspirator-1 if they were confirmed to meet on Tuesday, May 27, 2025, and stated he would provide the inspectors' information on May 23, 2025.

58.     On May 23, 2025, UU-1 asked Yuan for the names of the inspectors and notified the group that the equipment would be picked up by three trucks. Co-conspirator-1 then messaged the group requesting that Yuan direct the engineers not to tell UC-1 about "where the merchandise is going" and "Don't mention any information about [our] end in China and don't talk about who made arrangements for everyone." A few minutes later, Yuan responded "Alright."

59.     On May 23, 2025, Co-conspirator-2 addressed Yuan, stating that CW-1 "will soon be arranging for his associates, [should we] pull him into the group chat? You and [CW-1] should

first go over what it is you are going to do; if anything is unclear, you can have [Hong Kong Logistics Company's] colleagues explain it again."

60.     Later the same day, on May 23, 2025, Co-conspirator-2 urged Yuan to make the arrangements quickly, emphasized that it was very important, and requested that Co-conspirator-3 and Yuan quickly coordinate with each other about the inspection. Approximately one hour later, Yuan messaged the names and ID numbers (last four digits of their driver's license number) for six individuals scheduled to inspect the Nvidia GPUs and equipment and requested confirmation of the warehouse location. The names and ID numbers for the inspectors matched the identities of the six inspectors Co-conspirator-4 provided to UC-1 before the inspection.

61.     On May 27, 2025, BIS conducted an undercover operation to observe the inspection of the mislabeled GPUs. UC-1 and other undercover agents watched as the inspectors arranged by Yuan opened each box of GPUs, verified that each box contained the mislabeled GPUs, and inventoried each box's contents. Agents saw that the inspectors carried packets of instructions written in English and Mandarin. The instructions had photographs of Nvidia labels, and Nvidia baseboards altered with the "SANDKYAN" labels. The inventory list possessed by the inspectors included: "91 H200 GPU baseboards, 43 Nvidia A100 GPU modules, 14 cards, 2 whole servers, and 29 motherboards."

62.     After the inspectors completed their inventory of the GPUs, Co-conspirator-4 informed UC-1 that $1 million was wired to the Houston-based bank account. Co-conspirator-4 confirmed the payment by sending screenshots of wire payment authorization to the Houston account, through a messaging application. After confirming receipt of the funds, UC-1 informed Co-conspirator-4 that the cargo could not be loaded until the next morning because it was too late in the day.

21

63.    The next morning, May 28, 2025, three semi-trucks arrived – just as Co-conspirator-1 had previewed in a message on May 23, 2025 – to retrieve the GPUs.  However, BIS Agents arrived, placed the warehouse contents, including the GPUs, under detention and moved them to a government storage facility.

64.    On May 27, 2025 (the day of the "inspection" by IT Company employees) and May 28, 2025 (the day BIS detained the goods), two individuals were present outside the warehouse. A BIS agent spoke with one of the individuals who identified himself as the attorney for Colorado Company-2 and gave the BIS agent his contact information and business card.  The attorney worked for a law firm based in the PRC.

65.    In total, BIS detained: 91 units of NVIDIA HGX H200 141GB 700W 8-GPU Baseboards (ECCN 4A090.a); 20 Units of NVIDIA HGX GPU 8x A100 640GB baseboards (ECCN 4A090.a); 6 Units of SuperMicro SuperServer 420GP-TNAR/420GP-TNAR+ (ECCN 5A002.z); 25 units of SuperMicro A+ server configured with A100 baseboards (5A002.z); 14 boxes of 10 units H200 (ECCN undeterminable because of unknown specifications); 23 NVIDIA baseboards (unknown part and model due to label modifications).  These GPU baseboards and servers were worth approximately $30.3 million.

66.    Based on the information available to agents regarding the controlled servers, GPUs and baseboards, BIS agents did not identify any valid export licenses or license applications for these detained items.

67.    Regarding the detention of equipment, on May 28, 2025, Co-conspirator-3 addressed Yuan, stating "I'm thinking this is how to initially reply: if DHS reaches out to [an engineer who inspected the GPUs], who went over today, then have him say that the company arranged for him to come by for the inventory.  If DHS emails our HR, then have HR notify us,

22

and then we can consider how to respond." Yuan replied, "What is [Hong Kong Logistics Company's] relationship to these goods? We need to figure out what to say in our response as quickly as possible (based on the facts); if DHS starts investigating, then time is going to get really tight."[6]

68.    Also on May 28, 2025, UU-2added another unidentified user ("UU-3") to the group chat. UU-2 immediately notified the group that the products were detained by the U.S. Department of Commerce. Another unidentified user in the group chat, ("UU-4"), responded stating the trucks were cancelled and that the truck driver reported there were many police officers at the scene asking where the cargo was going. UU-4 stated he "told his proxy to just say they don't know anything." Five minutes later, UU-2 sent a message stating "dissolve this group chat. Delete everyone."

### 3. Yuan Was Involved in Developing a Potential Response to USG Using False Information Regarding Detention of GPUs From New Jersey Warehouse

69.    On May 29, Yuan addressed Co-conspirator-2 and Co-conspirator-3 in their group chat, inquiring, "what progress has there been on the matter of the [Hong Kong Logistics Company] New York merchandise?" Co-conspirator 2 responded, "Nothing thus far" and "[Has someone] contacted us?" I understand these messages were related to the goods detained from the New Jersey Warehouse.

70.    On June 3, 2025, BIS sent a notice regarding the detention of controlled goods to the attorney who was physically present on May 27, 2025 and May 28, 2025 outside the warehouse.

---

[6] I understand DHS to refer to the Department of Homeland Security. I understand that the co-conspirators believed that DHS was the law enforcement agency that detained the GPUs and other equipment. On June 3, 2025, BIS sent a detention notice and the co-conspirators correctly referenced BIS after that time.

23

71.     On June 4, 2025, Yuan, and Co-conspirators 2 and 3 conducted a virtual meeting to discuss the detained GPUs.  On June 5, Co-conspirator-2 sent a pdf document titled "Equipment Procurement Framework" (in Mandarin).  This document outlined various supply chain scenarios.  One of the scenarios contemplated a purchase from a U.S. supplier by Singapore Company-1, a sale to [Colorado Company-2] then a lease to IT Company.  Another scenario contemplated a further step where IT Company subleased the goods to another U.S. company.

72.     On June 6, 2025, Co-conspirator-2 added Yuan to a group chat named "Responding to U.S. Cargo Detention Issues," a conversation about ongoing issues with export-controlled Nvidia products that were detained by BIS from the New Jersey Warehouse.  UU-3 began the conversation addressing Co-conspirator-2 and stating that compliance paperwork was required to purchase the GPUs from a U.S. supplier.  UU-3 explained that, because there had been changes to the procurement chain, it was possible IT Company would "absorb the shipment."  UU-3 noted some of the items on the compliance paperwork needed to be redone.  UU-3 further explained the correct method to fill out end user and purpose paperwork for the following products, in what appeared as an attempt to circumvent U.S. export controls:

> Module
> End User: USA (domestic use in US, stock for maintenance services)
> Purpose: large-scale HPC Simulations (backup support)
>
> Server
> End User: local services, computing power rental
> Purpose: large-scale HPC simulations research (electric vehicles/education/healthcare/social media)
>
> H200 Cards
> End User: USA(domestic use, stockpile for maintenance services)
> Intended Use: large-scale HPC simulation (backup support)

24

73.     On June 6, 2025, Co-conspirator-2 posted a word document in a group chat that included Yuan and Co-consipirator-3, titled "Overview- US Merchandise Investigation Response.docx." The document included what appears to be a summary of events and issues that required explanation and offered ideas to cover up what transpired. Specifically, the document included the following:

**Order, delivery, and logistical timelines for the merchandise:**
1. The [Purchase Order] for this batch of goods was between March 3rd and May 7th; the date of the invoice was between April 30th and May 9th; and the delivery was taken between April 30th and May 9th.

2. After taking delivery, the merchandise arrived at the warehouse between May 2nd and 11th (Los Angeles warehouse/New Jersey warehouse); on May 15th, [the representative of U.S. Logistics Company] moved the goods from the NJ warehouse A to NJ warehouse B.

3. May 27th, engineers from [IT Company] travel to warehouse B for the goods inspection.

4. May 28th, the goods were detained by BIS.

5. All times presented are in US time.

**Sorted issues that still need to be resolved:**
1. Did [IT Company] purchase the equipment from [Colorado Company-2] or [Singapore Company-1]? Consider the following problems:
1) [Colorado Company-2] is actually a shell company that cannot stand up to in-depth scrutiny by BIS.
2) If the goods were procured from [Singapore Company-1], it might lead BIS to target [Singapore Company-1] for in-depth investigation, for example by retrieving [Singapore Company-1]'s records in the bank SWIFT system;
3) If the decision is made to use [Colorado Company-2], then suitable cover will have to be provided for the company, for example, building a simple company website.

25

2. There's no way to explain procurement of the 100x H200 cards (belonging to another owner) and the 29x motherboards found and detained at Warehouse B.

3. [Colorado Company-2]'s compliance documents need [to reflect] the buyer information for [Singapore Company-1] and the end use.

4. Missing records of communication and transaction documents that would have been exchanged between [Singapore Company-1, [Colorado Company-2], and [IT Company] for this batch of goods. After determining the path of transaction for the goods, also need to fill in the corresponding contracts/[purchase orders]/invoices.

5. Is it necessary to carry out filing procedures for [IT Company]'s purchase of these goods?

6. The following issues [when addressing] inquiries from the US lawyer: [Since] [IT Company] is a US company with a background of Chinese capital, does the path of transaction we designed for procuring this equipment violate US EAR regulations? Are there any other potential risks for our prepared path of transaction under US regulatory requirements?"

74.    On June 7, 2025, Yuan responded with a voice note to Co-conspirator-2, summarizing his understanding of the documents BIS was requesting, including the invoice and proof of payment. Yuan said if "it's being switched" to IT Company being the client, the "time is wrong" on some of the documents related to the transaction. Yuan further stated, "don't you think manipulating this…wouldn't it be quite obvious? They would definitely have doubts…" He added that now that U.S. law enforcement was involved there should be "deliberation on this thing with the documents." I understand these messages to show Yuan stating that the inconsistencies in the underlying documents would make it obvious that IT Company is not or was not the customer for the GPUs.

26

**4. For a Separate Batch of GPUs, Yuan Directs the Storage of GPUs in IT Company's Offices, Removal of Nvidia Labels and Eventual Export of GPUs**

75.    In addition to the detained equipment from the New Jersey Warehouse, Yuan also directed actions regarding a separate shipment of 85 GPUs.  Specifically, Yuan discussed the storage of GPUs with Co-conspirators -2 and -3 at IT Company's offices after BIS detained the $30 million of equipment on May 13, 2025.  On May 17, 2025, Co-conspirator-2 addressed Yuan, requesting a voice call because Co-conspirator-2 was "doing a favor for a friend and need[ed] to find a warehouse on short notice."  After the voice call, Yuan sent the address of IT Company's offices in Sterling, Virginia with a "Point of Contact" as CW-1.  On May 18, 2025, when asked by Co-conspirator-3 if the office had 50-60 square meters of space, Yuan replied, "GPU Servers? Storing for how long?"  Over the next few days, Co-conspirator 3 continued detailing the qualities of the warehouse needed for storage including that "It shouldn't be in one of those large and open public warehouses," and "have your associates at [IT Company] search around for an industrial building nearby."

76.    On May 28, 2025, CW-1 notified agents that a shipment of Nvidia GPUs was being stored inside the office of IT Company in Sterling, Virginia.  CW-1 provided agents with photographs of marked Nvidia boxes.  The following day, on May 29, 2025, CW-1 notified agents that CW-1 was contacted via a messaging application by Co-conspirator-5.

77.    Co-conspirator-5 instructed CW-1 to remove all Nvidia product labels from the GPUs and repackage and relabel the parcel inside IT Company's office for a potential shipping date of May 30, 2025.

78.    On May 29, 2025, Co-conspirator-3 posted a Group Chat History of messages from Co-conspirator-5 in the group chat with Yuan and Co-conspirator 2, which were communications between Co-conspirator- 5 and CW-1:

Good morning [CW-1], when you get to work on Friday, could you please help take care of the goods at the office? We've arranged for someone to come collect them, so if you could help out with the following:

1. Is the one big box on the ground product that we are holding temporarily? If not, do those 25 smaller boxes in total belong to us?

2. Please open all of the outer boxes and remove the labels with the words Nvidia from the smaller packages. You can use a box cutter to remove them. There are 85 smaller packages in total that need to get done.

3. Once you're finished with that, please reseal the boxes. If there's any stretch wrap, please wrap the individual boxes up and print out the "exterior box [shipping] mark," one for each of however many boxes there are then stick them on the outside of each box.

79.     On May 29, 2025, in a group chat that included Co-conspirator-5 and Co-conspirator-3, CW-1 asked, "What is it we need to do for him? I see he listed a bunch of things in the group chat."  I understand "him" to be referring to Co-conspirator-5.  In response, "Co-conspirator-3 stated that he spoke with Yuan and discussed what needs to be done with the GPUs.  Co-conspirator-3 further continued and explained that CW-1 only needed to confirm the number and size of the boxes of GPUs and "as for the labels, you can just say you're waiting for your boss's instructions."  When CW-1 asked, "Should I respond to [Co-conspirator-5] in the group chat?" Co-conspirator 3 responded, "Manager Yuan does not want that done.  He's concerned there could be problems."  CW-1 later informed law enforcement that CW-1 believed that this message meant Yuan compromised with the removal of the labels but did not want the fake labels to be applied to the Nvidia GPUs as requested by Co-conspirator-5 because it would be suspicious.  On May 30, 2025, after CW-1 completed the task, he provided the removed Nvidia labels to agents.

28

80.     Also on May 30, 2025, CW-1 was contacted by a logistics company headquartered in Shenzhen, China ("Shenzhen Logistics Company"), which also transports within the United States and Canada, to arrange for the transportation of the GPUs.  On June 2, 2025, the GPUs were picked up at IT Company's office in Sterling, Virginia.  CW-1 sent agents a photo of the bill of lading listing IT Company as shipper.  Agents tracked the shipment of GPUs from Virginia to a logistics warehouse in New Jersey.  Records obtained during the investigation showed that Singapore Company-1 purchased these GPUs from Massachusetts Company-1 and shipped them under the name of Colorado Company-2, but used IT Company's Virginia address.

81.     On June 2, 2025, CW-1 received an unexpected package from Hong Kong, China, which was delivered to IT Company's office on May 30, 2025.  When CW-1 opened the package, he discovered it was filled with hundreds of preprinted labels, including new barcodes and "SANDKYAN" product labels identical to those placed on the GPUs in the New Jersey Warehouse.

82.     On June 3, 2025, BIS agents conducted an industry outreach at the logistics warehouse in New Jersey that received the GPUs that were picked up from IT Company's office.  Warehouse employees told the agents they only handle imports – no exports – and that their business model is importing from China.  Agents located the GPUs from IT Company, but the pallet was adorned with counterfeit labels, misidentifying the GPUs as "Contactor controllers," which matched the labels Co-conspirator-5 had forwarded to CW-1.  The Nvidia GPUs were palletized and identified as being made in Taiwan.  When questioned about the pending export inside an import-only warehouse, employees explained that their headquarters was notified that a customer needed temporary storage at its facility with no additional information.  The packing slip for the GPUs showed the shipment was purportedly for export to a company located in Germany ("German Company").  Certain elements of the export documents bore similarities to other

29

shipments that BIS was investigating. That is, the packing list for the export showed the same address in Colorado as documents from the exports of GPUs to Canada involving Hong Kong Logistics Company. Specifically, the address on the packing list was the same address as Colorado Company-1's address, listed as the shipper on EEI filings for the exports to Canada that went onward to Hong Kong, described in Paragraph [44]. Furthermore, registration documents for German Company revealed the company was registered at the German consulate in China by Co-conspirator-1 using his PRC passport.

83.     However, after the agents visited the warehouse, agents learned that the commercial documents and freight forwarder for these GPUs had suddenly changed. On June 6, 2025, agents learned of and requested records for the GPUs that were pending export to Taiwan via airfreight on June 8, 2025. The mislabeled GPUs were booked for transport by air from Newark, New Jersey to San Francisco, California, and then to a company in Taipei, Taiwan. The shipper and USPPI was identified as Massachusetts Company-1; the commodity description was "Contactors Controller, Non-Hazardous." The packing list, commercial invoice, and airway bills identified the items as "PCIE Modules" – 85 PCIE Modules packaged in 26 boxes. PCIe modules, also known as PCI Express modules, are high-speed modules that are used to connect various hardware components, including GPUs. Depending on the exact specifications, PCIe modules are often classified under ECCN 5D002 or classified as EAR99. The end-user certifications were signed by a Singapore company ("Singapore Company-1"). On that same day, June 6, 2025, BIS informed the freight forwarder that the shipment was detained.

84.     On June 7, 2025, Co-conspirarator-2 left a voice note stating, "Mr. Yuan, so that matter of the merchandise today, just forget it, yeah?…they just had a meeting, and the thinking is that after this… it's too risky…so just don't look into it."

30

85.     On June 10, 2025, agents conducted a physical inspection of the GPU shipment that was shipped from IT Company's offices.  The shipment consisted of one pallet, which contained 26 individual boxes.  The agents opened each box and confirmed its contents.  In total, the shipment contained 85 Nvidia A100 SXM4 80GB w/HS (3U) GPUs. Nvidia A100 GPUs are classified under ECCN 3A090.a, which require licenses for export to the PRC, including Hong Kong.  These GPUs were worth approximately $663,000.

86.     On June 14, 2025, UU-2 messaged Co-conspirator 1 in the group chat and requested an update regarding the 85 GPUs.  Co-conspirator-1 replied that BIS responded and requested documentation related to the shipments, which the freight forwarder was unable to provide.  Co-conspirator-1 stated he provided the freight forwarder with two documents and sent a link to a .pdf file titled "PCIE Module Catalogue," and a screenshot showing flight information for the Massachusetts Company-1 shipment from Newark, New Jersey, to San Francisco, California, with a final destination of Taipei, Taiwan.  The screenshot also included an inventory description of "contactors controller, non-hazardous."  These documents appeared to refer to the shipment of 85 Nvidia GPUs, model: A100 SXM4 80GB w/HS (3U) that BIS detained on June 10, 2025, after tracking it directly from IT Company's office, as referenced in Paragraph [82].

87.     Based on the information available to agents regarding the shipments of controlled GPUs, BIS agents did not identify any valid export licenses or license applications for these detained items 85 A100 GPUs classified under ECCN 3A090.a

## **CONCLUSION**

88.     Based on my training and experience, and further supported by the facts in this affidavit, I submit that there is probable cause to believe that Benlin Yuan has conspired to violate

31

ECRA and the EAR in violation of 50 U.S.C. §§ 4819 (a)(1), (a)(1)(A), (a)(2)(D), and (b); and 15

C.F.R. §§ 736.2(b)(1), 742.6, and 764.2 and part 774, Supp. No. 1.

Respectfully submitted,

*Tyler Fox*

Tyler Fox, Special Agent
U.S. Department of Commerce
Bureau of Industry and Security
Office of Export Enforcement

Subscribed and sworn to before me telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on this 28th day of November 2025, and I find probable cause.

Hon. Richard W. Bennett
United States Magistrate Judge